**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

**2024 MSPB 6**

Docket No. DC-315H-18-0258-I-4

**Lois A. Starkey,**

**Appellant,**

**v.**

**Department of Housing and Urban Development,**

**Agency.**

March 22, 2024

John J. Rigby, Esquire, Arlington, Virginia, for the appellant.

Nicole Y. Drew, Washington, D.C., for the agency.

**BEFORE**

Cathy A. Harris, Chairman
Raymond A. Limon, Vice Chairman

## OPINION AND ORDER

¶1 The agency has filed a petition for review of the initial decision, which reversed the appellant's probationary termination. For the reasons discussed below, we DENY the agency's petition for review and AFFIRM the initial decision.

## BACKGROUND

¶2 The appellant filed the instant appeal, asserting that the agency terminated her competitive-service probationary appointment for partisan political reasons. *Starkey v. Department of Housing and Urban Development*, MSPB Docket

No. DC-315H-18-0258-I-1, Initial Appeal File (IAF), Tab 1 at 6. The administrative judge held the requested hearing before issuing an initial decision. *Starkey v. Department of Housing and Urban Development*, MSPB Docket No. DC-315H-18-0258-I-3, Appeal File (I-3 AF), Hearing Transcript (HT)[1]; *Starkey v. Department of Housing and Urban Development*, MSPB Docket No. DC-315H-18-0258-I-4, Appeal File (I-4 AF), Tab 4, Initial Decision (ID).

¶3　　　The following facts, as further described in that initial decision, are not materially disputed. In June 2017, the Trump administration named a new political appointee as General Deputy Assistant Secretary for Housing (GDASH). HT at 171 (testimony of the GDASH). Prior to this political appointment, some of the appointee's professional experience included working for Republicans in both houses of Congress. *Id.* at 171-72.

¶4　　　The next month, in July 2017, the agency hired the appellant as a GS-14 Manufactured Housing Specialist, a career competitive-service position, within the agency's Office of Manufacturing Housing Programs (OMHP), in Washington, D.C. IAF, Tab 11 at 23. The appellant's prior professional experience included several positions with the Manufactured Housing Institute, most recently as the Vice President of Regulatory Affairs, as well as a Legislative and Policy Associate position with the National Council of State Housing Agencies. I-3 AF, Tab 7 at 20-24. In addition, the appellant had worked as a Legislative Assistant for a Democratic Congressional representative, served as a political appointee for the Carter administration, held an elected position as a member of her local Democratic committee, and managed the campaign of her husband, who ran for elected office as a Democrat. *E.g.*, I-3 AF, Tab 7 at 24-25;

---

[1] We note that the table of contents to the transcript identifies incorrect page numbers for the testimony of the appellant's first-level supervisor and altogether omits the testimony of another witness, the Senior Advisor. *Compare* HT at 3 (table of contents), *with* HT at 225-26 (introducing the appellant's first-level supervisor and placing her under oath), 269-70 (introducing the Senior Advisor and placing her under oath). However, there is no reason to believe that the transcript is otherwise incomplete or inaccurate.

HT at 10-12 (testimony of the appellant). The appellant's first-, second-, and third-level supervisors held career positions with the agency. HT at 108-09 (testimony of the second-level supervisor), 227 (testimony of the first-level supervisor), 371-72 (testimony of the third-level supervisor). Notably, though, the second-level supervisor had political ties that included running for office as a Republican in the 1990s, but more recently running as a Democrat in 2011. HT at 109 (testimony of the second-level supervisor).

¶5     Just days after the appellant began working for the agency, the head of a Washington, D.C.-based industry group—the Manufactured Housing Association for Regulatory Reform (MHARR)—sent a complaint to several agency officials, including the agency's White House Liaison, advisors to the President, and the Chief of Staff to the Secretary of Housing and Urban Development. IAF, Tab 6 at 15-16, 19-20, 29. In this letter, MHARR complained that the agency had retained the appellant's second-level supervisor, "an Obama Administration holdover," and hired the appellant, "an Obama donor herself," whom he further described as having connections to "Obama supporter, Warren Buffet." *Id.* at 15-16. He attached public contribution records to evidence the appellant's contributions to "Obama for America" in 2012. *Id.* at 17. Among other things, the MHARR complaint described the agency's actions in this regard as "amazingly ill-considered, offensive and arguably scandalous," surmising that both individuals would "defy and resist" the administration's policies. *Id.* at 15.

¶6     In August 2017, the month after the agency hired the appellant, she met with her first- and second-level supervisors to discuss an ongoing dispute between the agency and a state partner, the Oregon State Administrative Agency. IAF, Tab 6 at 11-12; HT at 123 (testimony of the second-level supervisor). The appellant suggested that it might be helpful to discuss the matter with the Oregon Manufactured Housing Association to assist in resolving the dispute, and her second-level supervisor agreed. The second-level supervisor tasked the appellant with contacting the Oregon Manufactured Housing Association. HT

at 123-24 (testimony of the second-level supervisor). This was not well received by the agency's state partners in Oregon.

¶7    In September 2017, the agency's state partners in Oregon sent a letter to the Secretary of Housing and Urban Development, threatening to withdraw from their partnership, in part due to the appellant's alleged sharing of "sensitive government-to-government discussions with outside parties." IAF, Tab 11 at 17-21. When this complaint reached the appellant's second-level supervisor, she issued an internal memorandum to the appellant's third-level supervisor and the GDASH, defending OMHP's action and assuring them that the appellant had not shared any confidential or sensitive information. IAF, Tab 6 at 31-32.

¶8    In October 2017, the head of MHARR sent another complaint to the agency that was the subject of discussions among the appellant's first-, second-, and third-level supervisors. I-3 AF, Tab 9 at 98-99. However, it is not apparent whether that complaint, like the prior MHARR complaint, involved anyone's political affiliation. *Id.*

¶9    In a November 2017 performance appraisal by her first- and second-level supervisors, the agency rated the appellant "outstanding," the highest possible rating, and described her as an "invaluable asset." I-3 AF, Tab 7 at 26-37. Yet, despite the support from her immediate chain of command, the appellant's third-level supervisor terminated the appellant soon thereafter, after consulting with the GDASH and others. IAF, Tab 1 at 9-10; HT at 188-89 (testimony of the GDASH), 341-45 (testimony of the third-level supervisor). The reason for the December 19, 2017 termination, as described in the termination letter, was the appellant's alleged release of sensitive information to industry stakeholders in Oregon, as described in the complaint by the agency's partners from Oregon State Government. IAF, Tab 1 at 9, Tab 11 at 17-18. The day before, the GDASH also detailed the appellant's second-level supervisor from her GS-15 position as Administrator of OMHP to a position described as comparable to that of an

administrative assistant. HT at 109, 131 (testimony of the second-level supervisor), 181 (testimony of the GDASH).

¶10 The appellant filed the instant appeal, arguing that the agency impermissibly terminated her for partisan political reasons. IAF, Tab 1 at 6. The administrative judge agreed and reversed the probationary termination, finding that officials cited the Oregon complaint as a mere pretext to remove the appellant for known political affiliations. ID at 38-49.

¶11 The agency filed a petition for review. *Starkey v. Department of Housing and Urban Development*, MSPB Docket No. DC-315H-18-0258-I-4, Petition for Review (PFR) File, Tab 1. The appellant filed a response, and the agency replied. PFR File, Tabs 5, 9. The parties also submitted competing arguments, evidence, and pleadings regarding interim relief. PFR File, Tab 5 at 4, Tabs 6-7, Tab 9 at 4-5.

## ANALYSIS

### The agency failed to comply with its interim relief obligations.

¶12 The Board's regulations provide that, if an appellant was the prevailing party in the initial decision, and the initial decision granted the appellant interim relief under 5 U.S.C. § 7701(b)(2)(A), an agency's petition for review must be accompanied by a certification that the agency has complied with the interim relief order. *Thome v. Department of Homeland Security*, 122 M.S.P.R. 315, ¶ 15 (2015); 5 C.F.R. § 1201.116(a). The Board's regulations further contemplate that if an agency fails to submit the required certification with its petition, the Board may, in its discretion, dismiss the agency's petition for review. *Guillebeau v. Department of the Navy*, 362 F.3d 1329, 1332-33 (Fed. Cir. 2004) (discussing how the regulatory provisions required dismissal until May of 1999, when the Board amended the regulation to establish that dismissal was discretionary); *Thome*, 122 M.S.P.R. 315, ¶¶ 15-16; 5 C.F.R. § 1201.116(e).

¶13 A separate provision explains that an appellant may request dismissal of an agency's petition for failing to provide the required interim relief, but the Board will dismiss the appellant's motion if it is not filed within 25 days of the date of service of the agency's petition, unless the appellant shows that the motion is based on information not readily available before the close of the time limit. 5 C.F.R. § 1201.116(d).

¶14 Here, although the appellant requested dismissal of the agency's petition for its failure to provide interim relief, she did not do so within the allotted time, and we have no reason to conclude that her untimely motion was based upon new information. *See* PFR File, Tab 7. Accordingly, we dismiss the appellant's motion, pursuant to 5 C.F.R. § 1201.116(d). The question remains, however, whether the Board should dismiss the agency's petition on its own accord. *See* 5 C.F.R. § 1201.116(a), (e); *see also Harding v. Department of Veterans Affairs*, 451 F. App'x 947, 950 (Fed. Cir. 2011) (stating that "even without a timely challenge to the agency's interim relief, the Board remains obligated to ensure that the agency has complied with the interim relief order").[2]

¶15 In the initial decision, dated October 21, 2019, the administrative judge ordered the agency to provide interim relief and warned of the consequences for failing to do so. ID at 51. Nevertheless, the agency did not include certification regarding interim relief with its November 22, 2019 petition for review, as required under the Board's regulations. PFR File, Tab 1; 5 C.F.R. § 1201.116(a). Instead, the agency waited until after the appellant requested dismissal of its petition for review before submitting a "Notice of Interim Relief," nearly 3 months after the issuance of the initial decision and 2 months after the agency filed its petition for review. PFR File, Tab 6. In that pleading, the agency indicated that the appellant "will receive the same grade, pay, and employment benefits as her previous position" and "will return to duty on January 21, 2020."

---

[2] The Board may follow a nonprecedential decision of the U.S. Court of Appeals for the Federal Circuit when, as here, it finds it to be persuasive. *Caros v. Department of Homeland Security*, 122 M.S.P.R. 231, ¶ 24 n.11 (2015).

*Id.* at 4.  The agency also attached a Standard Form 52, dated the day before, retroactively placing the appellant in an interim appointment as of the date of the initial decision in this appeal.[3]  *Id.* at 7.  Simply put, nearly 3 months after the order to do so, the agency had still not provided the appellant with all of her interim relief and had only just begun the process of doing so. *Compare* ID at 51, *with* PFR File, Tab 6 at 7.  The agency provided no explanation for its delay.  Nevertheless, we find that the appellant will not be prejudiced by a decision on the merits of the agency's petition, and considering the totality of the circumstances, we decline to dismiss the agency's petition for failure to provide interim relief.

We clarify the legal standard for an appeal brought under 5 C.F.R. § 315.806(b).

¶16      An individual in the competitive service who, like the appellant, is serving an initial probationary period and has not completed 1 year of current continuous service has no statutory right of appeal to the Board.  *Marynowski v. Department of the Navy*, 118 M.S.P.R. 321, ¶ 4 (2012); IAF, Tab 1 at 4, 9; *see* 5 U.S.C. § 7511(a)(1)(A).  However, under certain limited circumstances, there may be a regulatory right of appeal under 5 C.F.R. § 315.806.  As relevant here, such an individual "may appeal . . . a termination not required by statute which he or she alleges was based on partisan political reasons or marital status."  5 C.F.R. § 315.806.  To establish Board jurisdiction under that provision, the appellant must prove by preponderant evidence that her termination was, in fact, based on partisan political reasons or marital status.[4]  *Marynowski*, 118 M.S.P.R. 321, ¶ 5.

---

[3] The agency indicated that it would not return the appellant to her previous office with OMHP because it had determined that her presence there would be unduly disruptive. PFR File, Tab 6 at 4, 7 (citing 5 U.S.C. § 7701(b)(2)(A)(II)).  We will not review that determination.  *Cook v. Department of the Army*, 105 M.S.P.R. 178, ¶ 7 (2007) (stating that the Board does not have the authority to review the merits of the agency's determination that his return would be unduly disruptive).

[4] An appellant has the right to a hearing on the jurisdictional issue only if she first makes a nonfrivolous allegation of jurisdiction, i.e., allegations of fact that, if proven, would establish that her termination was based on partisan political reasons or marital status.  *Green-Brown v. Department of Defense*, 118 M.S.P.R. 327, ¶ 5 (2012).  An

¶17　　In adjudicating appeals under this provision, the Board and the U.S. Court of Appeals for the Federal Circuit have found that an appropriate analytical framework can be adapted from Title VII Federal sector discrimination law. *Stokes v. Federal Aviation Administration*, 761 F.2d 682, 686-87 (Fed. Cir. 1985); *McClintock v. Veterans Administration*, 6 M.S.P.R. 475, 478 (1981). We reaffirm that approach, while noting one important difference between Title VII and the regulatory appeal right at issue here, i.e., the difference between motivating factor and but-for causation.

¶18　　Under Title VII, Federal personnel actions "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The Board has interpreted this language as setting forth a motivating factor standard of causation. *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶¶ 20-21; *see also Babb v. Wilke*, 589 U.S. 399, 406-07 (2020) (interpreting "shall be made free from" to mean motivating factor causation in the context of the Federal sector provision of the Age Discrimination in Employment Act). To prove motivating factor causation, the appellant need only show that the prohibited consideration played any part in the way the decision was made, even if the agency would ultimately have made the same decision in the absence of the discriminatory motive. *Wilson v. Small Business Administration*, 2024 MSPB 3, ¶ 11; *Pridgen*, 2022 MSPB 31, ¶ 21. In contrast to Title VII, under 5 C.F.R. § 315.806(b), the appellant must prove that her termination was "based on" partisan political reasons or marital status. We hold that, under this regulation, the appellant is required to prove that the prohibited consideration was a but-for cause of her termination. In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176-77 (2009), the Supreme Court found that 29 U.S.C. § 623(a)(1), which prohibits discrimination "because of age" in private sector employment, should be read as requiring that the plaintiff prove but-for

---

appellant who establishes Board jurisdiction under 5 C.F.R. § 315.806(b) thereby prevails on the merits.

causation. The Court further found that the statutory phrases "based on" and "because of" have the same meaning in this regard. *Id.* (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007)). But-for causation is a higher standard than motivating factor and requires proof that the prohibited consideration was necessary to the outcome of the agency's decision. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1740 (2020); *Wilson*, 2024 MSPB 3, ¶ 15; *Pridgen*, 2022 MSPB 31, ¶¶ 21-22 & n.4.

¶19 Notwithstanding these differences between Title VII and 5 C.F.R. § 315.806(b), Title VII analytical frameworks remain applicable to the extent that they may be used to prove but-for causation. As far as section 315.806(b) is concerned, the appellant may proceed in at least two ways. First, in cases involving at least some circumstantial evidence, an appellant may use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Wilson*, 2024 MSPB 3, ¶¶ 16-17 (explaining how *McDonnell Douglas* may be used to prove but-for causation in a Title VII claim). Second, the appellant may prove but-for causation under a mixed-motive framework. *See id.*, ¶ 18. The appellant may also choose to proceed under both theories simultaneously. *See id.*, ¶ 19.

¶20 In this case, the appellant proceeded under the *McDonnell Douglas* framework. *See* I-4 AF, Tab 3. To prove but-for causation under *McDonnell Douglas*, the appellant must first establish a prima facie case of discrimination. *Wilson*, 2024 MSPB 3, ¶ 16. To establish a prima facie case, an appellant must generally show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination. *Id.*; *see Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575-77 (1978). If the appellant makes out a prima facie case, then the burden shifts to the agency to provide a nondiscriminatory explanation for the action. *Wilson*, 2024 MSPB 4, ¶ 17. If the agency fails to give a nondiscriminatory explanation or the appellant proves that the agency's

explanation was pretext, then the appellant has proven that discrimination was a but-for cause of the action. *Id.*

The appellant met her burden of proof.

¶21 Broadly speaking, the administrative judge found that the appellant's termination was unusual, not justified, and notably comparable to the reassignment of the other individual targeted by MHARR's partisan political complaints—the appellant's second-level supervisor. ID at 41-49. He also found that the GDASH was responsible for both actions, and he did not credit the GDASH's testimony that she knew of the second-level supervisor's political affiliation but not the appellant's. ID at 38-41. Under these circumstances, as further discussed in the initial decision, the administrative judge concluded that the appellant's termination was based on partisan political reasons and that the Oregon incident was merely used as a pretext for doing so. ID at 49. For the following reasons, we agree.

> *The decision to terminate the appellant's appointment was unusual and unjustified.*

¶22 The stated reason for the appellant's termination was her alleged sharing of sensitive information with the Oregon Manufactured Housing Association, as described in the Oregon complaint. IAF, Tab 1 at 9-10, Tab 11 at 17. Yet the appellant's second-level supervisor, who was both an attorney and the Administrator of OMHP, responded by issuing a contemporaneous intra-agency memorandum to explain otherwise. IAF, Tab 6 at 31-32; HT at 106-09 (testimony of the second-level supervisor). That memorandum was directed to the appellant's third-level supervisor and the GDASH. IAF, Tab 6 at 31-32.

¶23 During the hearing, the appellant's second-level supervisor further discussed the appellant's handling of the ongoing dispute between the agency and its Oregon partner. Among other things, she described how the appellant had not shared confidential or sensitive information, and in fact had acted in accordance with advance instructions from her chain of command and existing OMHP policy,

which was set by the second-level supervisor herself. HT at 125-29, 133, 138-52 (testimony of the second-level supervisor). The second-level supervisor also explained that a prior Deputy Administrator of OMHP had used the same policy and that OMHP had recently handled a comparable situation with another state partner, Michigan, in a similar manner. *Id.* at 124, 132, 138, 150-52, 161.

¶24     The appellant's first-level supervisor, who was Deputy Administrator of OMHP during the relevant period and was also serving as Acting Administrator of OMHP by the time of hearing, provided additional support for the appellant's actions. HT at 246, 248-53 (testimony of the first-level supervisor). She testified that the second-level supervisor was responsible for establishing the policy, she agreed with the policy at the time, and the appellant carried out the policy in good faith, notwithstanding the negative reaction from their state partner in Oregon. *Id.* This individual indicated that upon taking over as Acting Administrator, she ran OMHP somewhat differently than the outgoing Administrator to "cover" herself and avoid repercussions stemming from the politics surrounding OMHP work. *Id.* at 247-49, 262-64.

¶25     The appellant provided a written statement and testimony similar to that of her first- and second-level supervisors. IAF, Tab 6 at 11-12; HT at 28-30 (testimony of the appellant). She indicated that her second-level supervisor, as Administrator of OMHP, had broad authority and exercised that authority in a manner comparable to years past, when different officials were in control of OMHP and the appellant was on the receiving end of those policies in the private sector. HT at 34-37 (testimony of the appellant).

¶26     Neither of the appellant's immediate supervisors was involved in the appellant's termination. The first-level supervisor testified that she first learned of the appellant's termination after it had already occurred and that no one ever explained to her the reason for the termination or who made the decision. HT at 232-33, 238-39, 251, 261 (testimony of the first-level supervisor). The first-level supervisor described those circumstances as unusual, indicating

that she had never experienced a similar situation and she was not aware of anything similar involving other agency employees and their supervisors. *Id.* at 233, 261-62. The appellant's second-level supervisor testified that she, too, was not consulted on the appellant's termination and was shocked to learn about it, after the fact. HT at 129-30, 133-34, 155-56 (testimony of the second-level supervisor).

¶27 The administrative judge found the appellant and her first- and second-level supervisors to be credible witnesses. ID at 15 n.23, 19 n.29, 22 n.36. To resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found the chosen version more credible, considering such factors as: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) the witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987). The Board must defer to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on observing the demeanor of witnesses testifying at a hearing; the Board may overturn such determinations only when it has "sufficiently sound" reasons for doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). In fact, the Board must give "special deference" to an administrative judge's demeanor-based credibility determinations, "[e]ven if demeanor is not explicitly discussed." *Purifoy v. Department of Veterans Affairs*, 838 F.3d 1367, 1373 (Fed. Cir. 2016).

¶28 In this matter, the administrative judge properly considered the *Hillen* factors and made demeanor-based credibility determinations. Concerning the appellant, he noted that her version of events was internally consistent and

corroborated in material part with the other credible evidence of record. Moreover, he observed that the appellant appeared sincere and responsive when testifying. ID at 15 n.23. The administrative judge determined that the first-level supervisor was an "extremely credible witness" who had no apparent motive to lie or fabricate her testimony. He found that her testimony was "straightforward, sincere, unrehearsed, and consistent with the credible record evidence." ID at 22 n.36. Additionally, the administrative judge concluded that the second-level supervisor's testimony was corroborated by other record evidence and that she testified in a believable and straightforward manner without a sign of improper bias. ID at 19 n.29. There are no "sufficiently sound" reasons for overturning the administrative judge's demeanor-based credibility determinations in this case. Therefore, we defer to them. *See Purifoy*, 838 F.3d at 1373; *Haebe*, 288 F.3d at 1301.

¶29 In contrast to the appellant's first- and second-level supervisors—the ones who were not consulted but had OMHP expertise, a detailed understanding of what occurred, the authority to direct the appellant's actions, and a firm belief that the appellant was an outstanding employee who had acted appropriately—agency officials involved in the appellant's termination, including the appellant's third-level supervisor, the Senior Advisor to the GDASH, the GDASH, and the Acting Associate General Counsel, lacked or ignored the relevant facts and expertise.

¶30 The appellant's third-level supervisor, who signed the appellant's termination letter, indicated that she lacked expertise in OMHP matters and was unsure whether the appellant's information sharing was appropriate. HT at 335-36, 338, 352 (appellant's third-level supervisor). The third-level supervisor also testified that she failed to realize that the second-level supervisor had instructed the appellant to engage in the information sharing and, in hindsight, she acknowledged the appellant should not have been blamed. *Id.* at 350-51, 375. She did, however, recall that the appellant's second-level

supervisor defended the appellant's actions as consistent with existing OMHP policy. *Id.* at 350. Once again, the second-level supervisor's defense is reflected in her memorandum to the third-level supervisor and the GDASH. IAF, Tab 6 at 31-32. According to her meeting notes and hearing testimony, the third-level supervisor discussed the second-level supervisor's defense of the appellant when summoned to a meeting with the GDASH and the Senior Advisor to consider terminating the appellant. HT at 335-36 (testimony of the third-level supervisor); I-3 AF, Tab 12 at 4. However, she described the GDASH and the Senior Advisor as insisting that the appellant's actions were incorrect and contrary to law. HT at 335-36 (testimony of the third-level supervisor); I-3 AF, Tab 12 at 4.

¶31 The Senior Advisor to the GDASH, who testified that she first raised the idea of terminating the appellant in the aforementioned meeting, indicated that she had many years of experience within the agency but no experience working with OMHP. HT at 274, 276, 279, 284-85 (testimony of the Senior Advisor). Nevertheless, she concluded that the appellant should be terminated based on the Oregon complaint alone, without additional investigation or information, including whether the appellant had simply followed existing policy and instructions from her chain of command. *Id.* at 275-76, 279-82, 291-92 (testimony of the Senior Advisor). The Senior Advisor disputed the third-level supervisor's meeting notes and testimony, asserting that the third-level supervisor did not disclose that the appellant's chain of command approved of the appellant's conduct. *Compare id.* at 290-91, 298-302, *with* HT at 335-36 (testimony of the third-level supervisor); IAF, Tab 6 at 31-32; I-3 AF, Tab 12 at 4. She instead described the third-level supervisor as a passive participant in the meeting who essentially agreed to carry out the termination without explanation or objection. HT at 302, 304-06 (testimony of the Senior Advisor). Nonetheless, the Senior Advisor suggested that the circumstances of the termination were somewhat unusual because a first- or second-level supervisor

would ordinarily be involved, but she indicated that it was not required. HT at 312-14, 323 (testimony of the Senior Advisor).

¶32    The GDASH indicated that she was not an expert in the field and she had a limited understanding of OMHP policy.  HT at 212-15 (testimony of the GDASH).  She also acknowledged that the appellant's second-level supervisor had broad discretion to set OMHP policy.  *Id.* at 222.  However, the GDASH could not recall the second-level supervisor's memorandum defending the appellant's actions, which was addressed to the GDASH and assured her that the appellant had acted appropriately.  *Id.* at 179-80; IAF, Tab 6 at 31-32.  Similarly, the GDASH could not recall pertinent details of the termination meeting with the appellant's third-level supervisor and the Senior Advisor, including whether there was a discussion about the second-level supervisor's defense of the appellant.  *Compare* HT at 179-80, 195-97 (testimony of the GDASH), *with* IAF, Tab 6 at 31-32; I-3 AF, Tab 12 at 4.  The GDASH did, however, recall coming to the conclusion that the appellant's actions were grounds for dismissal.  HT at 185-91, 195-99 (testimony of the GDASH). The GDASH indicated that she came to this conclusion after reviewing the Oregon complaint and consulting with others, such as the appellant's third-level supervisor, her Senior Advisor, and the Acting Associate General Counsel. *Id.* at 186-87, 214-15.

¶33    The Acting Associate General Counsel attended a meeting (different than the one discussed above) with the Senior Advisor and the appellant's third-level supervisor to discuss the Oregon complaint.  I-3 AF, Tab 12 at 4; HT at 324 (testimony of the Senior Advisor).  During the hearing, this Acting Associate General Counsel testified that, although her office was the program counsel for OMHP, OMHP did not regularly seek their counsel during the relevant time period.  HT at 394-95, 406-09 (testimony of the Acting Associate General Counsel).  As a result, OMHP tended to take actions that she was late to learn about, and she found many of those actions concerning.  *Id.* at 405-09.

She testified that when the Oregon complaint was brought to her attention, she was again surprised and concerned. *Id.* at 396-401. However, to the extent that her concern involved the appellant, it largely centered on what the appellant might have shared during a conference call referenced in the Oregon complaint. *Id.* at 401-05, 438-39. She described this unknown as warranting follow-up to determine whether the appellant's information sharing was "exceedingly bad" versus something that creates "an appearance of impropriety" and "does not appear to be consistent with what [the agency] should be releasing." *Id.* at 439. Yet, the Acting Associate General Counsel did not know whether any follow-up actually occurred. *Id.* at 427-28, 439-40. She also acknowledged that she did not know whether the appellant's information sharing was consistent with existing OMHP policy or her supervisor's instructions. *Id.* at 413, 427-30, 435-36, 438-39.

¶34     Approximately 1 week after the meetings discussed above, without any further investigation or inquiry, the agency terminated the appellant's appointment. *Compare* I-3 AF, Tab 12 at 4-5 (emails indicating that the termination meetings occurred on December 11, 2017), *with* IAF, Tab 1 at 9-10 (December 19, 2017 termination notice), *and* HT at 291-93 (testimony of the Senior Advisor). Although the GDASH, the Senior Advisor, and the Acting Associate General Counsel all testified that they did not realize the appellant's second-level supervisor had authorized the appellant's information sharing, they nevertheless indicated that the appellant's termination remained warranted because the appellant should have known not to follow those instructions. HT at 209 (testimony of the GDASH), 281-82, 293-94 (testimony of the Senior Advisor), 414-17 (testimony of the Associate General Counsel). The administrative judge disagreed, finding no persuasive support for that conclusion. ID at 44 n.68.

¶35     Unlike his determination that the appellant, her first-level supervisor, and her second-level supervisor were credible witnesses, the administrative judge

expressed varying degrees of reservation concerning the credibility of those involved in the appellant's termination. He found the Acting Associate General Counsel's testimony to be largely credible, though hyperbolic at times. ID at 35 n.58, 38 n.63. He found the appellant's third-level supervisor to be somewhat credible but concluded that she colored her testimony to try to justify the appellant's termination and her involvement in the same. ID at 34 n.56. The administrative judge found that the Senior Advisor and the GDASH were not credible. ID at 26 n.43, 29-30 n.47. He determined that the Senior Advisor's memory was foggy regarding a number of relevant facts and that the justifications she offered based on her own experience to support her conclusion that the appellant had engaged in misconduct were "somewhat misleading and unsound." ID at 29-30 n.47. He also made demeanor-based credibility findings regarding the GDASH. ID at 26 n.43. In reaching these conclusions, the administrative judge appropriately considered the *Hillen* factors and relied on his observations of the witnesses' demeanor. Accordingly, we defer to his credibility findings. *See Purifoy*, 838 F.3d at 1373; *Haebe*, 288 F.3d at 1301; *Hillen*, 35 M.S.P.R. at 458.

¶36    On review, the agency argues that the appellant's termination was warranted and that the administrative judge erred by concluding otherwise. PFR File, Tab 1 at 6-7, 14-15. The agency notes that the appellant's first-level supervisor[5] indicated that Oregon's threat to withdraw from its partnership with the agency was unusual. *Id.* at 6 (citing HT at 244, 255-56 (testimony of the first-level supervisor)). However, the testimony that the agency references merely describes Oregon's threat to withdraw from its partnership with the agency as unusual; it does not suggest that the appellant acted unusually or inappropriately.

¶37    The agency also recounts how the Acting Associate General Counsel testified that the sharing of information described in the Oregon complaint was

_____

[5] In making this argument, the agency described this individual as the appellant's second-level supervisor. PFR File, Tab 1 at 6. However, upon further review, it appears that the agency intended to refer to the appellant's first-level supervisor, not her second-level supervisor, given the testimony referenced.

both unusual and something the agency should not do.[6] PFR File, Tab 1 at 6-7, 14-15 (citing HT at 395-96, 398, 429 (testimony of the Acting Associate General Counsel)). But again, this same official also indicated that she was not aware of any specific prohibition against the appellant's information sharing and she did not know whether OMHP policy permitted the same; she instead expressed her opinion that OMHP policies and the appellant's chain of command should not have authorized the appellant's information sharing. HT at 428-30, 435-38 (testimony of the Acting Associate General Counsel). In other words, the Acting Associate General Counsel expressed disagreement with the policies and decisions of the OMHP Administrator, another attorney who had acted within her designated authority. Moreover, as previously mentioned, the Acting Associate General Counsel was most concerned with what the appellant may have shared during a conversation referenced in the Oregon complaint, yet the agency failed to conduct any substantive follow-up about the same. *Id.* at 439.

¶38    The agency next argues that the appellant's sharing of information regarding Oregon was not comparable to how OMHP handled the situation with Michigan because only Oregon responded by threatening to withdraw from their partnership. PFR File, Tab 1 at 7 (citing HT at 151-52 (testimony of the second-level supervisor), 257 (testimony of the first-level supervisor)). However, we are not persuaded that the different reactions from these two state partners are particularly relevant. What is most relevant is evidence that OMHP handled these state partners similarly.

¶39    In sum, the evidence of record supports a finding that the appellant acted in accordance with past practices by OMHP, existing OMHP policy, and the instructions of her second-level supervisor, the Administrator of OMHP. Nevertheless, roughly 3 months after the Oregon complaint, officials who lacked or ignored those facts convened to abruptly terminate the appellant's

---

[6] The agency's petition for review states that this individual found the appellant's information sharing "very usual," but it is apparent that the agency intended to state that she found the information sharing unusual. PFR File, Tab 1 at 6.

appointment, without any investigation and without consulting the appellant's first- or second-level supervisors.

*The GDASH was responsible for the appellant's termination.*

¶40    As the administrative judge discussed, there is some conflicting evidence regarding the degree to which the GDASH—the only political appointee involved in this matter—was responsible for the appellant's termination.[7] ID at 24-25, 31-33 & n.51, 56.  Again, the appellant's second-level supervisor responded to the Oregon complaint by issuing an internal memorandum to the appellant's third-level supervisor and the GDASH, defending the appellant's actions and assuring them that the appellant had not shared any confidential or sensitive information.  IAF, Tab 6 at 31-32.  The third-level supervisor testified that she believed this explanation.  HT at 332-33, 335 (testimony of the third-level supervisor).  However, she was reportedly convinced otherwise by the GDASH, her Senior Advisor, and the Acting Associate General Counsel. *E.g.*, I-3 AF, Tab 12 at 4; HT at 276-79 (testimony of the Senior Advisor), 335-39 (testimony of third-level supervisor), 412-15 (testimony of the Acting Associate General Counsel).  The third-level supervisor initially indicated that she made the termination decision herself but later testified that she was instructed to terminate the appellant's appointment during a meeting with the GDASH, the Senior Advisor, and an Employee Labor Relations Specialist.  HT at 343-44, 389-91 (testimony of the third-level supervisor).

¶41    The Senior Advisor characterized the third-level supervisor as a passive participant when summoned to the meeting to discuss the appellant's termination. HT at 302, 304-06 (testimony of the Senior Advisor).  She also indicated that she, herself, first raised the idea of termination.  *Id.* at 276, 279.  The GDASH denied directing the third-level supervisor to terminate the appellant's appointment but

[7] Unlike the GDASH, who was a Republican political appointee, the political affiliations or preferences of others involved in the appellant's termination are not apparent based on the record.

acknowledged that she consented to the action, was accountable for it, and was happy to take responsibility for it. HT at 188-91 (testimony of the GDASH).

¶42    After reviewing these accounts, the administrative judge concluded that the GDASH, in consultation with the Senior Advisor and an Employee Labor Relations Specialist, was the agency official who made the termination decision and directed the third-level supervisor to carry it out. ID at 38. He noted that others were involved, but the GDASH was the only official with the authority to direct the third-level supervisor to act. ID at 38 n.64. As mentioned above, he also found that the third-level supervisor colored her testimony in an attempt to justify the GDASH's directive, notwithstanding her own concerns about the legitimacy and abnormality of the termination. ID at 33 n.56.

¶43    On review, the agency does not dispute the GDASH's responsibility over the termination, and we discern no reason to disturb the administrative judge's conclusion on the point. The GDASH called a meeting with her subordinate—the third-level supervisor—for the purpose of recommending that she effectuate the appellant's probationary termination. The third-level supervisor abruptly did so, just days later, in the unusual manner described above.

> *The administrative judge correctly found that the GDASH's testimony denying that she knew of the appellant's political affiliation was not credible.*

¶44    It is undisputed that the appellant has extensive personal and professional ties to the Democratic Party, which were included in her resume and discussed during an office-wide introduction on her first day of work. I-3 AF, Tab 7 at 24-25; HT at 10-15 (testimony of the appellant), 111-12 (testimony of the second-level supervisor). It is also undisputed that, after her appointment, the head of an industry group, MHARR, sent at least one written complaint to the agency about the political leanings of the appellant. IAF, Tab 6 at 15-17; I-3 AF, Tab 9 at 98-99; HT at 112-13, 240-43 (testimony of the second-level supervisor).

¶45     The appellant's first-level supervisor testified that she knew the appellant previously held a political appointment.  I-3 AF, Tab 7 at 24-25; HT at 228 (testimony of the first-level supervisor).  Her second-level supervisor testified that the appellant gave a full history of her background, including her political affiliation with the Democratic Party, during an office-wide meet-and-greet event on the appellant's first day of work at the agency.  HT at 111-12 (testimony of the second-level supervisor).

¶46     In contrast, the officials involved in the termination all denied knowing of the appellant's political affiliation and indicated that they could not recall seeing anything that would have revealed her political affiliation.  HT at 210-12 (testimony of the GDASH), 284 (testimony of the Senior Advisor), 372 (testimony of the third-level supervisor), 423 (testimony of the Acting Associate General Counsel).  Despite some indication that the third-level supervisor may have been involved in the office-wide introduction where the appellant discussed her background, the third-level supervisor said she did not recall the meeting.  HT at 111-12 (testimony of the second-level supervisor), 228-30 (testimony of the first-level supervisor), 328 (testimony of the third-level supervisor).  She also could not recall any MHARR complaint targeting the appellant but acknowledged seeing complaint letters from MHARR, including some "attacking" the appellant's second-level supervisor.  HT at 328-30 (testimony of the third-level supervisor).

¶47     Like the third-level supervisor, the Acting Associate General Counsel acknowledged seeing MHARR complaints targeting the appellant's second-level supervisor but could not recall whether any targeted the appellant.  HT at 423-26 (testimony of the Acting Associate General Counsel).  Generally, she testified that the MHARR complaints against the second-level supervisor were well known and that she "would be shocked" if the GDASH was not aware of them.  *Id.* at 426-27.  The Senior Advisor could not recall whether she had seen any letters from MHARR.  HT at 287 (testimony of the Senior Advisor).

¶48        The GDASH testified that she was familiar with MHARR sending many letters to the agency, and she also acknowledged having meetings with the head of MHARR.[8]  HT at 176-78, 202-03, 218-19 (testimony of the GDASH).  Yet, she indicated that she could not recall any specific MHARR complaint about the appellant, provided no details about her meetings with the head of MHARR, and denied knowing anything about the appellant's political affiliation.  *Id.* at 211-12, 218-19, 221-22.  The administrative judge did not find this testimony credible, instead concluding that the GDASH knew of the appellant's political affiliation during the relevant period.  ID at 26 n.43, 40-41.  Specifically, he found that her testimony that she did not recall any facts concerning her interactions with the head of MHARR or the substance of his numerous letters to "stretch the bounds of credulity."  ID at 41.  He reached this conclusion based upon numerous factors, including the GDASH's demeanor and the inherent improbability of her testimony because MHARR's complaints were so well known, frequent, and likely to be raised during the meetings between the GDASH and the head of MHARR.  ID at 26 n.43, 40-41.

¶49        On review, the agency argues that the administrative judge erred in finding that the GDASH was aware of the appellant's political affiliation.  PFR File, Tab 1 at 11-14.  The agency asserts that there is no evidence to prove that the GDASH reviewed the appellant's resume, that she was present during the meet-and-greet event in which the appellant discussed her background, or that she reviewed any specific MHARR letter complaining about the appellant's politics.  *Id.*

¶50        We are not persuaded by the agency's arguments.  There is ample evidence that the head of MHARR was quite focused on the politics of the appellant and her second-level supervisor—so much so that he regularly lodged complaints about them that were well known and widely distributed.  HT at 18-19 (testimony

---

[8] It is unclear whether any other officials were present at the meetings between the GDASH and the head of MHARR.  The GDASH's Senior Advisor testified that she could not recall any such meetings.  HT at 287 (testimony of the Senior Advisor).

of the appellant), 156-58 (testimony of the second-level supervisor), 240-43 (testimony of the first-level supervisor), 329-31 (testimony of the third-level supervisor), 449-51 (testimony of the Acting Associate General Counsel). The agency has not articulated a sufficiently sound reason for overturning the administrative judge's determination that it is improbable that the GDASH was unaware of the appellant's political affiliation, either from her review of MHARR's correspondence or from her direct meetings with the head of MHARR. *See Purifoy*, 838 F.3d at 1373; *Haebe*, 288 F.3d at 1301.

> *The circumstances of the second-level supervisor's reassignment are relevant to this appeal.*

¶51    The record shows that, the day before the appellant's probationary termination, the GDASH reassigned the appellant's second-level supervisor to an administrative position. The agency argued below that the second-level supervisor's reassignment is not relevant to the instant appeal. I-2 AF, Tab 2 at 26-27. However, we agree with the administrative judge that it is both relevant and material. ID at 47 n.73. Evidence of similarly situated individuals whom the employer treated similarly is commonly known as "me too" evidence, and its relevance and admissibility "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *see Didinger v. Allsteel, Inc.*, 853 F.3d 414, 424 (8th Cir. 2017).

¶52    In this case, both the appellant and her second-level supervisor were targets of MHARR's partisan political complaints, the official who decided to reassign the second-level supervisor was the same official who decided to terminate the appellant's appointment, these personnel actions were taken almost simultaneously, neither personnel action was subject to the kind of deliberation that might normally be expected, and, as with the termination, the agency's justification for the reassignment was weak at best. ID at 25-26 & n.43, 47-48; HT at 109, 131, 156 (testimony of the second-level supervisor), 181-84

(testimony of the GDASH), 316, 323 (testimony of the Senior Advisor), 387-88 (testimony of the third-level supervisor). Furthermore, the evidence closely correlates with and supports the appellant's theory of the case, i.e., the GDASH acquiesced to pressure from MHARR to get rid of certain OMHP officials, including the appellant, based on their political affiliation. On petition for review, the agency argues that, for various reasons, the second-level supervisor's reassignment does not suggest partisan political discrimination against the appellant. PFR File, Tab 1 at 8-10. We have considered the agency's arguments, but the agency has not identified any facts or circumstances that would alter our assessment of the reassignment and how it relates to the appellant's case or our overall conclusion that the appellant's termination was based on partisan political reasons.

¶53     To conclude, the agency has presented no basis for disturbing the administrative judge's findings of fact. We therefore affirm the initial decision. The evidence supports the conclusion that the appellant's termination was not justified, an innocent mistake, or otherwise excusable. Instead, the record before us indicates that, more likely than not, the termination was impermissibly based on partisan political reasons. The appellant proved, by preponderant evidence, that partisan political reasons were a but-for cause of her probationary termination. Accordingly, the probationary termination is reversed.

ORDER

¶54     We ORDER the agency to cancel the probationary termination and to retroactively restore the appellant effective December 19, 2017. *See Kerr v. National Endowment for the Arts*, 726 F.2d 730 (Fed. Cir. 1984). The agency must complete this action no later than 20 days after the date of this decision.

¶55     We also ORDER the agency to pay the appellant the correct amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this

decision. We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order. If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 calendar days after the date of this decision.

¶56　　　We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and of the actions it has taken to carry out the Board's Order. The appellant, if not notified, should ask the agency about its progress. *See* 5 C.F.R. § 1201.181(b).

¶57　　　No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision in this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communications with the agency. 5 C.F.R. § 1201.182(a).

¶58　　　For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

¶59　　　This is the final decision of the Merit Systems Protection Board in this appeal. Title 5 of the Code of Federal Regulations, section 1201.113 (5 C.F.R. § 1201.113).

## NOTICE TO THE APPELLANT
## REGARDING YOUR RIGHT TO REQUEST
## ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs.  To be paid, you must meet the requirements set out at Title 5 of the United States Code (U.S.C.), sections 7701(g), 1221(g), or 1214(g).  The regulations may be found at 5 C.F.R. §§ 1201.201, 1202.202, and 1201.203.  If you believe you meet these requirements, you must file a motion for attorney fees and costs WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION.  You must file your motion for attorney fees and costs with the office that issued the initial decision on your appeal.

## NOTICE OF APPEAL RIGHTS[9]

You may obtain review of this final decision.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions

---

[9] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions.  As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.   As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of the date of issuance of this decision.   5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.   Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.   The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.   This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.   If so, you may obtain

judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[10]  The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

---

[10]  The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

*Gina K. Grippando*

Gina K. Grippando
Clerk of the Board
Washington, D.C.



**DEFENSE FINANCE AND ACCOUNTING SERVICE**
**Civilian Pay Operations**

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805.  Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete.  Missing documentation may substantially delay the processing of a back pay award.  **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE:  Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐  1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket.  Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐  2) Settlement agreement, administrative determination, arbitrator award, or order.

☐  3) Signed and completed "Employee Statement Relative to Back Pay".

☐  4) All required SF50s (new, corrected, or canceled).  **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐  5) Certified timecards/corrected timecards.  **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐  6) All relevant benefit election forms (e.g. TSP, FEHB, etc.).

☐  7) Outside earnings documentation.  Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment.  Documentation includes W-2 or 1099 statements, payroll documents/records, etc.  Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:**  When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received.  The payroll office must collect the debt from the back pay award.  The annual leave will be restored to the employee.  Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).



## NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts**.**

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

   a. Employee name and social security number.
   b. Detailed explanation of request.
   c. Valid agency accounting.
   d. Authorized signature (Table 63).
   e. If interest is to be included.
   f. Check mailing address.
   g. Indicate if case is prior to conversion.  Computations must be attached.
   h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2. Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3. Outside earnings documentation statement from agency.
4. If employee received retirement annuity or unemployment, provide amount and address to return monies.
5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)
6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases:  (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

   a. Must provide same data as in 2, a-g above.
   b. Prior to conversion computation must be provided.
   c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.